## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

SHERRY L.[1],                              Case No. 2:23-cv-2458
     Plaintiff,                       Sargus, J.
                                    Litkovitz, M.J.

     vs.

COMMISSIONER OF                            **REPORT AND**
SOCIAL SECURITY,                           **RECOMMENDATION**
     Defendant.

Plaintiff, Sherry L. brings this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for disability insurance benefits (DIB).  This matter is before the Court on plaintiff's Statement of Errors (Doc. 8), and the Commissioner's response in opposition.  (Doc. 9).

## I.  Procedural Background

Plaintiff protectively filed an application for DIB on May 14, 2019, alleging disability beginning July 23, 2017, due to a brain injury and seizures.  (Tr. 483).  The application was denied initially and upon reconsideration.  Plaintiff, without the assistance of counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ) Irma J. Flottman.  Plaintiff and a vocational expert (VE) appeared by telephone and testified at the ALJ hearing on January 11, 2022.  (Tr. 303–29).  On May 25, 2022, the ALJ issued a decision denying plaintiff's DIB application.  (Tr. 250-72).  This decision became the final decision of the Commissioner when the Appeals Council denied review on June 2, 2023.  (Tr. 1-6).

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] last met the insured status requirements of the Social Security Act on December 31, 2021.

2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of July 23, 2017 through her date last insured of December 31, 2021 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the [plaintiff] had the following severe impairments: headaches status post traumatic brain injury ("TBI"); learning disorder/borderline intellectual functioning ("BIF"); and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [plaintiff] had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: capable of simple, routine, and repetitive tasks and instructions; capable of simple decision making; capable of adapting to routine changes; and capable of work that does not involve strict production rate or fast paced work.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[2]

_____

[2] Plaintiff's past relevant work was as a child monitor, a medium (sedentary as actually performed), semi-skilled position. (Tr. 266, 324).

7. The [plaintiff] was born [in]… 1979 and was 42 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The [plaintiff] has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569a).[3]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from July 23, 2017, the alleged onset date, through December 31, 2021, the date last insured (20 CFR 404.1520(g)).

(Tr. 255-67).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill,* __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S.

---

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled occupations in the national economy such as commercial cleaner (60,000 jobs in the national economy at the heavy exertional level and 217,000 jobs in the national economy at the medium exertional level), housekeeping cleaner (61,000 jobs in the national economy at the heavy exertional level), and hand packager (53,000 jobs in the national economy at the medium exertional level). (Tr. 266-67, 325-26).

197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Error

In her sole assignment of error, plaintiff alleges the ALJ erred in evaluating the persuasiveness of diagnostic opinions provided by consulting psychologist, Valerie Budervic, Psy.D. (Doc. 8 at PAGEID 1485-92). She argues the ALJ's decision did not comply with 20 C.F.R. § 404.1520c(b)(2) because she failed to properly consider the supportability and consistency of Dr. Budervic's opinions.

The Commissioner counters that the ALJ properly evaluated Dr. Budervic's opinions, including addressing the required regulatory factors of supportability and consistency. (Doc. 9 at PAGEID 1497-1505). Regarding supportability, the Commissioner argues the ALJ addressed this "factor by explaining that [Dr. Budervic's] 'opinion was made after a thorough evaluation of [plaintiff].'" (Doc. 9 at PAGEID 1502 citing Tr. 264). According to the Commissioner, "[t]his

statement by the ALJ acknowledged the examination Dr. Budervic conducted to support her opinion, and thus addressed the supportability factor." (Doc. 9 at PAGEID 1502).

As to the consistency of Dr. Budervic's opinion, the Commissioner argues this was met by the ALJ "properly evaluat[ing] the consistency of each of the functional area limitations opined by Dr. Budervic in comparison to the record to complete the required analysis and determine their persuasiveness." (*Id*. citing Tr. at 264-65).

**1. Dr. Budervic's Report**

Plaintiff was referred by the Ohio Division of Disability Determination for a mental disability consultative examination to clinical psychologist Dr. Budervic, who examined plaintiff for disability purposes on April 8, 2022. (Tr. 1429-48). The purpose of the examination was:

> • Examine for the presence or absence of a psychiatric disorder and provide a DSM diagnostic conclusion;
>
> • Provide Functional Assessment of [plaintiff's] abilities, and any limitations resulting from a DSM disorder, in:
>> 1. Understanding, carrying out, and remembering instructions, both one-step and complex;
>> 2. Sustaining concentration and persisting in work-related activity at a reasonable pace;
>> 3. Maintaining effective social interaction on a consistent and independent basis, with supervisors, co-workers, and the public; and
>> 4. Dealing with normal pressures in a competitive work setting.

(*Id*. at Tr. 1429-30).

Plaintiff reported to Dr. Budervic that when she was married, her husband "beat her in the head with a hammer" while she slept in 2018. (Tr. 1433). She was hospitalized for eight days due to the attack. (Tr. 1434). Plaintiff reported she suffered seizures following the assault, but the last seizure she experienced was four years prior to the evaluation. (*Id*.). The only known medical condition plaintiff reported was "brain damage." (*Id*.). Other than the hospitalization

after the assault in 2018, plaintiff reported only being admitted to the hospital for a hysterectomy, knee surgery, a kidney infection and the birth of her two children.  (*Id*.).

Plaintiff was personally interviewed by Dr. Budervic.  (*Id*. at Tr. 1431).  In addition to her own testing and evaluation, Dr. Budervic also reviewed plaintiff's records from Pickaway County Public School.  (*Id*.).  Plaintiff was assessed using a WISC-R[4] and scored a full-scale intelligence equivalent (FSIQ) of 69, which placed her in the "developmentally handicapped range, qualifying her for special education services at her school."  (*Id*.).  Dr. Budervic additionally reviewed plaintiff's records from OPG Ohio Health Physicians Group, dated February 2, 2019, where plaintiff was seen for a consultation for seizures and migraines due to a traumatic brain injury in January of 2018 causing episodes of decreased attentiveness and chronic headaches secondary to trauma.  She was prescribed Decadron and Topamax to help with her headaches.  (*Id*.).

Plaintiff reported to Dr. Budervic her chief complaints were "I can't read and write very well.  And I have really bad migraines headaches with my head."  (*Id*.).  Plaintiff denied a history of mental health diagnoses and did not report additional mental health concerns.  (*Id*.).  At the time of evaluation, plaintiff was not taking any medications.  (Tr. 1432).

Plaintiff reported to Dr. Budervic she was not currently working because "when I have my migraines sometimes I can't get out of bed for two or three days with them."  (*Id*.).  She reported she had not worked for seven or eight years prior to the evaluation.  (*Id*.).  When asked directly if her mental health prevented her from working, plaintiff replied "[n]ot really."  (*Id*.).  As to her work history, plaintiff related she had worked at Subway for three years, making sandwiches.  (*Id*.).  She felt she did "okay" at the job but reported getting into trouble with managers when she made food wrong due to her reading difficulties.  (*Id*.).  Plaintiff also worked at McDonald's for

---

[4] Weschler Intelligence Scale for Children-Revised.

7

three or four years making food. (*Id*.). When asked if she had any difficulties performing the duties of her job, she reported, "My reading affected it a lot," and "If I could read better[,] I could probably do a better job." (Tr. 1433). Plaintiff also worked at a truck stop as a line cook for five or six years. (*Id*.). She denied having any trouble performing her duties and believed she performed them "[r]eally good." (*Id*.). Plaintiff denied ever being fired from a job or receiving workplace accommodations. (*Id*.).

Regarding social interactions, plaintiff reported she gets along "pretty good" with family members, except her mother. (Tr. 1433-34). She reported no problems with interactions with friends and neighbors, and as to authority, she stated "I don't have a problem with nobody." (Tr. 1434). But with interactions with the public, she stated, "I get anxiety really bad sometimes." (*Id*.).

Plaintiff reported her highest education level was the 10th grade. (*Id*.). She told Dr. Budervic she had an Individualized Education Program (IEP) for a learning disability, which allowed her to be in smaller classes and receive one-on-one help from teachers. (*Id*.). She denied repeating a grade[5] but reported she received "poor grades." (*Id*.).

As to her daily living activities, plaintiff reported to Dr. Budervic she does not drive. (Tr. 1435). She related her ex-husband was controlling and would not let her get a driver's license. (*Id*.). Plaintiff reported she is responsible for herself. (*Id*.). Plaintiff stated she is able to prepare meals, pay bills, manage money, count change, take medications, shop, and use the internet, but she has significant difficulties with reading. (*Id*.). She manages stress by going for a walk. (*Id*.).

Dr. Budervic conducted diagnostic testing. Plaintiff was administered the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV) (Tr. 1436-1440), which included ten subtests from

---

[5] According to plaintiff's school records, she was retained in the first grade. (Tr. 577).

8

which plaintiff's composite scores were derived and is considered the most representative estimate of global intellectual functioning. (Tr. 1439). While being tested, plaintiff was observed to exhibit good effort, concentration, and motivation throughout the examination. Dr. Budervic reported the results of this assessment, taken as a whole, are "considered to be an accurate representation of [plaintiff's] abilities." (Tr. 1436).

Regarding plaintiff's general intellectual ability, plaintiff's results on the WAIS-IV placed her within the extremely low range of intellectual functioning, with a FSIQ of 63. (Tr. 1439). This score placed plaintiff's overall thinking and reasoning abilities to only exceed 1% of her peers. (*Id*.).

Plaintiff's verbal reasoning abilities were measured in the extremely low range, having scored a 63 on this portion of the test. (*Id*.). Her nonverbal skills were also measured to be in the extremely low range with a score of 69 on the Perceptual Reasoning Index subtest. (*Id*.).

Plaintiff's working memory index, *i.e.,* her ability to sustain attention, concentration, and exert mental control, was scored at 60. (Tr. 1440). This placed her in the extremely low range. (*Id*.). She performed on this portion of the WAIS-IV only better than approximately 0.4% of her peers. (*Id*.).

The WAIS-IV also evaluated plaintiff's processing speed index, *i.e.,* the speed at which plaintiff can mentally process simple or routine information without making errors. (*Id*.). Plaintiff scored an 84, which is in the low average range when compared to her peers. (*Id*.). Dr. Budervic noted this "may have practical implications for vocations programs in which successful adjustment depends upon quick and relatively error-free performance of simple tasks." (*Id*.).

Plaintiff was also administered the Wide Range Achievement Test - Fifth Edition (WRAT5) as part of Dr. Budervic's evaluation. (*Id*.). This test was used to measure plaintiff's

academic achievement in math, spelling, and reading and helps identify learning disabilities. (*Id*.).  It was noted plaintiff provided good effort, concentration, and motivation through this assessment.  (Tr. 1441).  Based on these factors, Dr. Budervic reported the results of the assessment were believed to be an accurate representation of plaintiff's academic abilities.  (*Id*.).  Plaintiff's scores included a math computation grade equivalent of 3.8 (very low range); a spelling grade equivalent of 2.6 (extremely low range); a word reading grade equivalent of 3.2, (extremely low range); a sentence comprehension grade equivalent of 2.0 (extremely low range); and a reading composite score in the extremely low range, with no grade equivalent given.  (*Id*.).  Based on plaintiff's objective test results, Dr. Budervic diagnosed borderline intellectual functioning; she was estimated to function in the extremely low range of intelligence; and based on vocabulary, fund of knowledge, and responses to specific questions, her intelligence was estimated to fall within the below average range.  (Tr. 1444).

On plaintiff's current clinical status and mental status examination, Dr. Budervic found plaintiff was generally cooperative and participated well.  (Tr. 1432).  Dr. Budervic determined plaintiff's responses were candid, and "[t]here were no clear signs of symptom fabrication or embellishment."  (*Id*.).  As to her mood and affect, plaintiff had no complaints; she stated her mood was "okay," and her affect was stable.  (*Id*.).  Plaintiff noted she was easily depressed, had nightmares related to her past physical trauma, and had a history of experiencing posttraumatic stress symptomatology.  (*Id*.).  Her thought process was noted as normal.  Dr. Budervic observed plaintiff as attentive, but she showed difficulty with concentration and focus.  (Tr. 1443).  Plaintiff demonstrated difficulty completing some tasks completely or quickly.  (*Id*.).  Based on simple tasks plaintiff was asked to perform, Dr. Budervic found plaintiff's "working memory, attention, and concentration were somewhat impaired."  (*Id*.).  Dr. Budervic opined plaintiff's judgment

was sound, and her insight was noted as fair.  (Tr. 1444).  However, Dr. Budervic noted plaintiff "appeared to have an unrealistic appreciation of strengths and weaknesses."  (*Id*.).

In assessing the reliability of plaintiff's assessment, Dr. Budervic relied on her evaluations and other sources of information, which included direct behavioral observations, plaintiff's self-report of symptoms, functional history, and available collateral information.  (Tr. 1444).  Dr. Budervic determined "there were no obvious, significant discrepancies what [plaintiff] related, what was in the collateral data, and [her] observations at the time of the evaluation."  (*Id*.).

Dr. Budervic assessed plaintiff's abilities and limitations in understanding, carrying out, and remembering instructions.  She opined plaintiff will have difficulties understanding, carrying out, and remembering instructions for more complex or multi-step tasks.  (Tr. 1446).  Plaintiff was unable to comprehend simple verbal instructions of complex tasks; Dr. Budervic opined she will need to have tasks explained and shown to her.  Further, plaintiff was able to complete basic tasks but may require extra time to learn new tasks and will require supervision on the completion of these tasks.  (*Id*.).

Dr. Budervic also assessed plaintiff's abilities and limitations in sustaining concentration and persisting in work-related activity at a reasonable pace.  She opined that if plaintiff is working at simpler tasks or tasks she finds interesting, she would likely not have significant difficulty sustaining concentration and persisting in work-related activity at a reasonable pace.  However, for more complex tasks, plaintiff will likely have difficulties and will require extra time and supervision to complete such tasks.  (Tr. 1446-47).

Dr. Budervic further assessed plaintiff's abilities and limitations in dealing with normal pressures in a competitive work setting.  She opined plaintiff exhibited some limitations with her ability to deal with normal pressures in a competitive work setting and would benefit from

learning and implementing appropriate coping strategies or being permitted to take additional short breaks while at work if mental health symptoms worsen while on the job.  (Tr. 1447).  Dr. Budervic concluded at the time of the evaluation, plaintiff appeared capable of managing at least basic tasks and interactions, with assistance from a supervisor or a job coach.  (Tr. 1447-48).

Dr. Budervic also opined plaintiff would lack the ability to manage a social security benefit because she demonstrated borderline intellectual functioning and may have difficulty understanding information.  (Tr. 1448).  Accordingly, Dr. Budervic thought plaintiff might benefit from appointing someone to assist her with the management of any allocated funds.  (*Id*.).

Dr. Budervic found plaintiff "meets the diagnostic criterial for a trauma-related disorder." (Tr. 1445).  Given plaintiff's apparent cognitive deficits and below average intellectual abilities, Dr. Budervic opined that plaintiff "has underdeveloped intellectual abilities and meets the criteria for a cognitive disorder."  (*Id*.).  DSM-5 diagnoses included posttraumatic stress disorder, acute stress disorder, and borderline intellectual functioning.

Dr. Budervic submitted a medical source statement of plaintiff's ability to do work-related activities from a mental health standpoint.  (Tr. 1426-28).  Dr. Budervic opined that plaintiff was moderately limited in her ability to understand, remember, and carry out simple instructions as well as make judgments on simple work-related decisions.  (Tr 1426)  She also opined that plaintiff was markedly impaired in her ability to understand, remember, and carry out complex instructions as well as make judgments on complex work-related decisions.  (*Id.*).  Dr. Budervic opined that plaintiff was mildly limited in her ability to interact with others.  (Tr 1427).  Dr. Budervic also stated that plaintiff's ability to concentrate, persist, and maintain pace were affected by her impairments.  Dr. Budervic stated, "The claimant's history of TBI combined with

12

borderline intellectual functioning and reading and writing impairments may interfere with her

ability to synthesize information and maintain job functions.  (Tr. 1427).

   **2.  The ALJ's evaluation of Dr. Budervic's opinions is not supported by substantial evidence.**

   For claims filed on or after March 27, 2017, new regulations apply for evaluating medical

opinions.  *See* 20 C.F.R. § 404.1520c (2017); *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819

(Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar.

27, 2017)).  These new regulations eliminate the "treating physician rule" and deference to

treating source opinions, including the "good reasons" requirement for the weight afforded to

such opinions.[6]  *Id.*  The Commissioner will "not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical

finding(s),[7] including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the

Commissioner will consider "how persuasive" the medical opinion is.  20 C.F.R. § 404.1520c(b).

   In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1)

supportability, (2) consistency, (3) relationship with the claimant, including length of treatment

relationship, frequency of examinations, purpose of the treatment relationship, and examining

relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical

opinion.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors the ALJ must consider are

---

[6] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion."  *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[7] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim."  82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850. For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians and psychologists as "assessments" or "opinions."

supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[8] and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 404.1520c(c)(2). The ALJ is required to "*explain* how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 404.1520c(b)(2) (emphasis added). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

### a. Supportability

As discussed above, Dr. Budervic opined that plaintiff was markedly or moderately limited in her ability to understand, remember, and carry out instructions. (Tr. 1426). The ALJ determined Dr. Budervic's opinions were not persuasive:

> Dr. Budervic opined that the claimant had moderate to marked deficits in the ability to understand, remember, and carry out instructions; mild deficits in interacting with others; and some limitation to concentration, persistence, and pace (Ex. 11F/2). This opinion was made after a thorough evaluation of the claimant. The marked deficits in the ability to understand, remember, and carry out instructions

---

[8] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

are not supported in the broader record, given the normal physical examinations, including those showing normal concentration, that the claimant was alert and oriented, had normal memory, and normal fund of knowledge and her self-reported lack of mental functional issues.  She reported she was able to understand directions in the past workplace, and though she was on an IEP in the past, she was never held back a grade in school (Ex. 11F/21).  Thus, that portion of the opinion is not persuasive.

(Tr. 264).

Plaintiff argues, and the Court agrees, that the ALJ erred by not considering the mandatory supportability factor pursuant to 20 C.F.R. § 404.1520c(b)(2), (c)(1).  The supportability factor requires an examination of the medical sources opinion: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions will be."  20 C.F.R. § 404.1520c(c)(1).  While the consistency factor requires the ALJ to compare the source's opinion to the *other* record evidence, supportability "addresses whether a medical professional has sufficient justification for their *own* conclusions."  *Elizabeth A. v. Comm'r of Soc. Sec. Admin.*, No. 2:22-cv-02313, 2023 WL 5924414, at *4 (S.D. Ohio Sept. 12, 2023) (emphasis in the original) (citing *Crystal E.J. v. Comm'r of Soc. Sec.*, No. 2:21-cv-04861, 2022 WL 2680069 (S.D. Ohio July 12, 2022)).  The ALJ is required to "explain how [she] considered the supportability" factor under the regulations.  20 C.F.R. § 404.1520c(b)(2).

The ALJ was required to evaluate and explain the extent to which Dr. Budervic's opinions were or were not supported by her objective findings and explanations.  *See Jenna B. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-cv-00176, 2022 WL 4395682, at *6 (S.D. Ohio Sept. 23, 2022) (ALJs are "required to explain their evaluation of the supportability and consistency factors.  [20 C.F.R. § 404.1520c(b)(2)].  The regulation therefore imposes a burden of explanation, or mandatory articulation, upon ALJs").  The ALJ's decision omits any analysis of the supportability

15

of Dr. Budervic's opinions vis-a-vis her testing and reported findings. *See Brooks v. Comm'r of Soc. Sec.*, No. 2:22-cv-158, 2024 WL 966560, at *5 (E.D. Tenn. Mar. 6, 2024) ("The 'fail[ure] to specifically cite to any examination findings or other evidence in the medical record' precludes this Court from being able to adequately review the ALJ's decision and renders the ALJ's explanation of the supportability factor inadequate.") (quoting *King v. Kijakazi*, No. 1:20-cv-196, 2021 WL 3520695, at *7 (E.D. Tenn. July 21, 2021), *report and recommendation adopted sub nom. King v. Comm'r of Soc. Sec.*, No. 1:20-cv-196, 2021 WL 3516659 (E.D. Tenn. Aug. 10, 2021)).  The Commissioner argues the ALJ in fact addressed the supportability factor by explaining that Dr. Budervic's "opinion was made after a thorough evaluation of the claimant." (*See* Doc. 9 at PAGEID 1502 citing Tr. 264).  The ALJ's statement does not, however, explain how she considered the supportability factor. *See* 20 C.F.R. § 416.920c(b)(2) ("[W]e will explain *how* we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision.") (emphasis added).  That a medical source rendered an opinion "after a thorough evaluation" says nothing about the supportability of that opinion based on the relevant objective evidence and explanations by the medical source. *See* 20 C.F.R. § 404.1520c(c)(1).  The ALJ's failure to explain how she considered the supportability factor precludes meaningful judicial review of the ALJ's decision. *See Charlene R. Comm'r of Soc. Sec.*, No. 1:22-cv-473, 2023 WL 5214688, at *3 (S.D. Ohio Aug. 15, 2023) (citing 20 C.F.R. § 404.1520c(b)(2)).

The ALJ committed the same error in evaluating other portions of Dr. Budervic's opinions.  For example, the ALJ's decision states:

> Dr. Budervic further opined that the claimant will have difficulties understanding, carrying out, and remembering instructions for more complex or multi-step tasks. She is able to comprehend simple verbal instructions of complex tasks and will need to have tasks explained and shown to her.  Further, the claimant is able to

16

complete basic tasks but may require extra time to learn new tasks and will require supervision on the completion of these tasks. The record does support some intellectual deficits, *though a need to have tasks explained and shown to her or a need for extra time or supervision are not specifically supported.* As such this portion of the opinion is not fully consistent with the record, and less persuasive. . . .

(Tr. 264-65) (emphasis added). The ALJ fails to identify the objective evidence or the explanations within Dr. Budervic's report that fail to support her opinion. Without any explanation by ALJ for her conclusion, the Court is unable to meaningfully review the ALJ's decision.

One final example will suffice. The ALJ addressed Dr. Budervic's opinion that plaintiff:

exhibits some limitations with her ability to deal with normal pressures in a competitive work setting and would benefit from learning and implementing appropriate coping strategies or being permitted to take additional short breaks while at work if mental health symptoms worsen while on the job. However, at this time, she appears capable of managing at least basic tasks and interactions, with assistance from a supervisor or job coach. Dr. Budervic also felt the claimant may benefit from a rep payee. Once again, the record does not support a need for a supervisor or job coach and also does not support a need for breaks, given the relative lack of mental health treatment and counseling, and her self-described activities of daily living including the ability to cook, do household chores, go for a walk when she feels stressed, go grocery shopping, attend medical appointments, participate in social clubs, and volunteer (Ex. 11F/11). As such, this portion of the opinion is not persuasive. . . .

(Tr. 265). The ALJ again fails to analyze Dr. Budervic's opinion for supportability under 20 C.F.R. § 404.1520c(c)(1). The ALJ does not identify the relevant objective testing evidence set forth in Dr. Budervic's 25-page, comprehensive report or explain why that testing does not support Dr. Budervic's opinion. Nor does the ALJ articulate why Dr. Budervic's thorough explanations for her opinions are not supported. The ALJ's decision falls far short of the regulatory requirements for determining the persuasiveness of Dr. Budervic's opinions.

"[A]n ALJ's failure to follow agency procedures does not constitute harmless error when it prevents [the Court] from meaningfully reviewing his or her decision. . . ." *Shields v. Comm'r*

*of Soc. Sec.*, 732 F. App'x 430, 440 (6th Cir. 2018).  In the absence of any explanation on the supportability factor, the Court finds the ALJ's persuasiveness evaluation of Dr. Budervic's opinions is not supported by substantial evidence.  This matter must be remanded for an evaluation of the supportability of Dr. Budervic's opinions pursuant to 20 C.F.R. § 404.1520c(c)(1), including an explanation by the ALJ for her findings.

There is an additional reason the Court cannot conclude that the ALJ's failure to properly assess the supportability factor is harmless error—the timing of Dr. Budervic's consultative examination.  The ALJ hearing, at which plaintiff was unrepresented, was held *before* plaintiff's consultative examination with Dr. Budervic.  The VE's testimony on jobs in the national economy did not include any consideration of a hypothetical based on Dr. Budervic's opinions. The ALJ did not resume the hearing after the consultative exam to obtain additional VE testimony based on the restrictions and limitations opined by Dr. Budervic.  An assessment of Dr. Budervic's opinions in accordance with the regulatory standards may result in a different outcome in this matter.

### b.  Consistency

The ALJ's failure to assess Dr. Budervic's opinions for supportability is in itself sufficient for a reversal and remand in this case, and the Court need not reach plaintiff's argument that the ALJ also erred in her consistency analysis.  Nevertheless, the Court briefly notes that the ALJ made factual and legal errors in her consistency analysis further supporting reversal and remand of this matter.

For example, the ALJ found Dr. Budervic's opinion on plaintiff's ability to understand, remember, and carry out instructions was, in part, not consistent with plaintiff's ability to understand directions in the past workplace, "and though she was on an IEP in the past, she was

never held back a grade in school." (Tr. 264).[9]  Plaintiff's school records show she was actually "retained" in the first grade.  (Tr. 577, 589).  Moreover, the Court is unable to discern why the ALJ considered *not* being held back a grade in school as inconsistent with Dr. Budervic's limitations, particularly for plaintiff who received special education assistance in smaller classes in all academic areas.  (Tr. 575, 603, 615).  Also, though plaintiff was able to understand directions in the workplace in the past, this does not account for the limiting effects of her TBI, which occurred several years *after* plaintiff was last employed.  The ALJ does not address why Dr. Budervic's contemporaneous testing and evaluation results are undermined by pre-TBI evidence.

In addition, the ALJ determined Dr. Budervic's opinion that plaintiff will "need to have tasks explained and shown to her or [] need for extra time or supervision are not specifically supported" and "not fully consistent with the record. . . ."  (Tr. 265).  However, the ALJ does not cite to any medical or other evidence that is inconsistent with Dr. Budervic's opinion in this regard.  The Court is simply unable to discern the ALJ's evidentiary basis for this finding.  In the absence of a sufficient explanation of consistency with the record as a whole, the Court cannot conclude that the ALJ's consideration of Dr. Budervic's opinions is supported by substantial evidence.

## III.  This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter.  *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[9]The fact plaintiff reported to Dr. Budervic that she was not held back in school suggests memory issues consistent with Dr. Budervic findings.

Therefore, it is recommended that this matter be reversed and remanded for further proceedings with instructions to the ALJ to reevaluate Dr. Budervic's report consistent with this decision and for further medical and vocational development as warranted.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Plaintiff's Statement of Errors (Doc. 8) be **SUSTAINED**;

2. The Commissioner's non-disability finding be **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS** consistent with this decision.

Date: 5/7/2024

Karen L. Litkovitz
Chief United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SHERRY L.,                                    Case No. 2:23-cv-2458
      Plaintiff,                          Sargus, J.
                                              Litkovitz, M.J.

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).